IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LEONEL O. MARTINEZ,

                                                                6:13-CV-384-PK

                                                                FINDINGS AND
                                                                RECOMMENDATION

                    Plaintiff,

v.


COLETTE S. PETERS, JEFF PREMO, M. YODER,
S.T.M. LT. YANCEY, S.T.M. LT. UFFORD,
STEVE FRANKE, and S.T.M. LT. STEPHENSON,



                    Defendants.

_____

PAPAK, Magistrate Judge:

        On March 6, 2013, plaintiff *pro se* Leonel O. Martinez, an incarcerated prisoner, filed

this action *in forma pauperis* as a purported class action against defendants Colette S. Peters, Jeff

Premo, M. Yoder, S.T.M. Lt. Yancey, S.T.M. Lt. Ufford, and Steve Franke, each purportedly in


Page 1 - FINDINGS AND RECOMMENDATION

both their individual and their official[1] capacities. On March 22, 2013, I denied Martinez' motion

to certify his claims for class treatment, and on October 7, 2013, Judge Brown affirmed that

disposition.[2] On September 10, 2013, Martinez moved for leave of court to file a "supplemental"

complaint, on November 12, 2013, Judge Brown granted Martinez' motion, and Martinez'

supplemental complaint was deemed filed as of that same date. By and through his complaint as

originally filed, Martinez alleges the liability of each defendant named therein under 42 U.S.C. §

1983 for the violation of his Fourteenth Amendment due process and equal protection rights in

connection with their conduct in holding Martinez in disciplinary segregation from September 12

through November 15, 2012, in placing Martinez under a "Security Threat Management"

classification for approximately six months in 2012 and 2013, and/or in restricting his activities

while so classified. By and through his supplemental complaint, Martinez additionally alleges

the liability of those defendants and of S.T.M. Lt. Stephenson under Section 1983 for the

violation of his Fourteenth Amendment rights in connection with his placement into disciplinary

segregation from July 8, 2013, through July 29, 2013. This court has federal-question

jurisdiction over Martinez' claims pursuant to 28 U.S.C. § 1331.

   Now before the court are Martinez' motion (#55) for summary judgment of the claim

---

[1] Because it is well established that an official-capacity suit under Section 1983
"represent[s] only another way of pleading an action against an entity of which an officer is an
agent," *Kentucky v. Graham*, 473 U.S. 159, 165 (1985), *quoting Monell v. Dep't of Soc. Servs. of
N.Y.C.*, 436 U.S. 658, 690 n.55 (1978), I construe Martinez' claims to the extent alleged against
the defendants in their official capacities as though instead alleged against the State of Oregon.
*See Hafer v. Melo*, 502 U.S. 21, 25 (1991).

[2] Accordingly, Martinez' action has at all times proceeded as an individual rather than a
class action, pursuant to "the general rule prohibiting *pro se* plaintiffs from pursuing claims on
behalf of others in a representative capacity." *Simon v. Hartford Life and Accident Ins. Co.*, 546
F.3d 661, 664 (9th Cir. 2008).

alleged by and through Martinez' originally filed complaint, defendants' cross-motion (#72) for summary judgment of that same claim, and defendants' motion (#91) to dismiss the claim alleged by and through Martinez' supplemental complaint for failure to exhaust administrative remedies. I have considered the motions and all of the pleadings and papers on file. For the reasons set forth below, Martinez' motion for summary judgment should be denied, and defendants' motions for summary judgment and to dismiss should each be granted.

## LEGAL STANDARDS

### I.    Cross-Motions for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party taking the position that a material fact either "cannot be or is genuinely disputed" must support that position either by citation to specific evidence of record "including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," by showing that the evidence of record does not establish either the presence or absence of such a dispute, or by showing that an opposing party is unable to produce sufficient admissible evidence to establish the presence or absence of such a dispute. Fed. R. Civ. P. 56(c). The substantive law governing a claim or defense determines whether a fact is material. *See Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998).

Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116

Page 3 - FINDINGS AND RECOMMENDATION

S.Ct. 1261 (1996). In evaluating a motion for summary judgment, the district courts of the

United States must draw all reasonable inferences in favor of the nonmoving party, and may

neither make credibility determinations nor perform any weighing of the evidence. *See, e.g.,*

*Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing*

*Products, Inc.*, 530 U.S. 133, 150 (2000).

On cross-motions for summary judgment, the court must consider each motion separately

to determine whether either party has met its burden with the facts construed in the light most

favorable to the other. *See* Fed. R. Civ. P. 56; *see also, e.g., Fair Hous. Council v. Riverside*

*Two*, 249 F.3d 1132, 1136 (9th Cir. 2001). A court may not grant summary judgment where the

court finds unresolved issues of material fact, even where the parties allege the absence of any

material disputed facts. *See id.*

## II.    Motion to Dismiss

To survive dismissal for failure to state a claim pursuant to Rule 12(b)(6), a complaint

must contain more than a "formulaic recitation of the elements of a cause of action;" specifically,

it must contain factual allegations sufficient to "raise a right to relief above the speculative level."

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To raise a right to relief above the

speculative level, "[t]he pleading must contain something more . . . than . . . a statement of facts

that merely creates a suspicion [of] a legally cognizable right of action." *Id., quoting* 5 C. Wright

& A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004); *see also* Fed. R.

Civ. P. 8(a). Instead, the plaintiff must plead affirmative factual content, as opposed to any

merely conclusory recitation that the elements of a claim have been satisfied, that "allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), *citing Twombly*, 550 U.S. at 556. "In sum, for a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009), *citing Iqbal*, 556 U.S. at 678.

"In ruling on a 12(b)(6) motion, a court may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007). In considering a motion to dismiss, this court accepts all of the allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *See Kahle v. Gonzales*, 474 F.3d 665, 667 (9th Cir. 2007). Moreover, the court "presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Nat'l Org. for Women v. Scheidler*, 510 U.S. 249, 256 (1994), *quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). The court need not, however, accept legal conclusions "cast in the form of factual allegations." *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

## FACTUAL BACKGROUND

### I.    The Parties

Plaintiff Martinez is an incarcerated prisoner currently housed at the Snake River Correctional Institution but at all times material to the conduct complained of in both his complaint and his supplemental complaint housed either at the Oregon State Penitentiary ("OSP") or the Two Rivers Correctional Institution ("TRCI"). Martinez' originally filed complaint contains exhibits constituting evidence sufficient to establish that Martinez had

Page 5 - FINDINGS AND RECOMMENDATION

available to him while incarcerated at OSP a three-level grievance procedure consistent with the regulations set forth in Chapter 291, Division 109, of the Oregon Administrative Rules.

Defendant Peters is, and at all material times was, the Director of the Oregon Department of Corrections ("ODOC"). Defendant Premo is, and at all material times was, the Superintendent of OSP. Defendant Yoder is, and at all material times was, the Assistant Superintendent (Security) of OSP. Defendant Franke is, and at all material times was, the Superintendent of TRCI. Defendants Yancey, Ufford, and Stephenson are ODOC lieutenants serving at all material times as members of ODOC's Security Threat Management Unit.

## II.    Material Background

### A.    Security Threat Management Program

At OSP as at other ODOC facilities, ODOC operates a Security Threat Management ("STM") program consistent with the regulations set forth in Chapter 291, Division 69, of the Oregon Administrative Rules. Pursuant to OSP's STM policies and procedures and to applicable Oregon Administrative Rules, STM personnel at OSP make affirmative efforts to "[i]dentify and effectively manage inmates and groups of inmates that in the judgment of the Department present an elevated security threat risk based on their criminal history, institutional conduct history, present behavior, interstate transfer status, [and] escape history, and based on intelligence." OAR-291-069-0200(3)(A). Based on "[i]nmate behavior which poses a significant threat to the safe and secure operation of the facility, including, but not limited to, threatening or inflicting bodily injury on another person, posing a high risk of escape, promoting or engaging in disruptive group behavior, distributing a controlled substance, or being involved in any other activity that could significantly threaten the safe and secure operation of the facility," OAR-291-

Page 6 - FINDINGS AND RECOMMENDATION

069-210(3), *see also* O.A.R. Ch. 291, Div. 69, Att. A, STM personnel may identify an inmate as

"a 'high alert' management inmate," OAR-291-069-0230(2).

(1)    Inmates identified by the department as "high alert" management inmates may be managed by the department's STM Unit.

(2)    Inmate Management Plans: The STM lieutenant will develop an approved Inmate Management Plan for each inmate identified by the department as a "high alert" management inmate.

    (a)    The Inmate Management Plan will be in writing and describe the behavior or other circumstance(s) that resulted in the inmate's identification as "high alert," and the department's corresponding program and behavior expectations for the inmate.

    (b)    The Inmate Management Plan may direct the denial, removal, suspension, restriction or modification of inmate programs, services or activities for the inmate to encourage an inmate to modify his or her behavior to conform to department rules, standards, and staff expectations, and to advance the inmate towards appropriate pro-social behavior, in accordance with these rules.

    (c)    The Inmate Management Plan will document any denial, removal, suspension, restriction, or modification of inmate programs, services or activities ordered for the inmate.

    (d)    The STM lieutenant will provide each high alert inmate with a copy of the inmate's Inmate Management Plan.

(3)    Denial, Removal, Suspension, Restriction or Modification of Inmate Programs, Services or Activities:

    (a)    Facility Programs, Work Assignments, and Clubs: An inmate under the management of the STM Unit may be denied participation in, or may be removed from, any work or program assignment, group activity or club if the inmate's participation is determined to present an undue risk to the safe, secure, orderly or efficient operation and management of the facility or as a part of an approved Inmate Management Plan.

    (b)    Other Inmate Programs, Services, and Activities: An inmate under the management of the STM Unit may have other inmate

programs, services, and activities suspended, restricted or modified by the department. Programs, services, and activities that may be affected include, but are not limited to, recreation yard, housing assignments, work assignments, canteen use, telephone use (except legal calls), visiting (except attorney visits), inmate-to-inmate mail, and television services.

(A)     An Inmate Management Plan that directs the suspension, restriction, or modification of programs or services to an inmate requires the approval of the STM Assistant Chief or designee.

(B)     An Inmate Management Plan that directs the suspension, restriction, or modification of programs or services to an inmate in excess of 90 days requires the approval of the Inspector General's Chief Investigator.

(C)     An Inmate Management Plan that directs the suspension, restriction, or modification of programs or services to an inmate in excess of 120 days requires the approval of the Inspector General.

(D)     Any suspension, restriction, or modification of programs or services provided to an inmate will be in accordance with the STM Restriction Scale. (Attachment B).

(4)     Temporary Placement in Disciplinary Segregation: With the approval of the functional unit manager or designee or the officer-in-charge, the STM lieutenant may order the immediate temporary placement of an inmate in disciplinary segregation when in his or her judgment the assignment is necessary to further the department's management of a specific security threat, or the safe, secure and orderly operation and management of the facility. An inmate managed by the STM unit will not be placed in temporary segregation beyond five working days; otherwise the placement will be considered Administrative Segregation in accordance with OAR 291-046.

OAR-291-069-0270(1)-(4). Inmates identified as high alert management inmates may obtain administrative review of such identification by submitting a written request to the Inspector General's Chief Investigator or designee at ODOC's central administrative offices within fifteen days following issuance of the Inmate Management Plan to the inmate." OAR-291-069-0280(1).

Page 8 - FINDINGS AND RECOMMENDATION

According to the declaration testimony of defendant Yancey, who serves as the Administrator of ODOC's STM Unit, inmates identified as high alert management inmates "continue to live in general population," Declaration (#68, 74) of Douglas Yancey ("Yancey Decl."), ¶ 9, unless the risk they present is so extreme that they "require maximum supervision," in which case they are not managed by the STM Unit but rather are "placed in special housing," *id.* at ¶¶ 6-7, *see also* O.A.R. Ch. 291, Div. 55. High alert management inmates who do not require maximum supervision are managed by the STM Unit for a minimum period of six months and a maximum period of five years. *See* Yancey Decl., ¶ 9. "If the inmate's institutional behavior is appropriate and there are no security concerns at the end of the initial six-month period, the inmate drops off of the STM program and reverts to regular supervision in general population." *Id.*

### B.   Prohibited Inmate Conduct, Processing Disciplinary Actions, and Administrative and Disciplinary Segregation

At OSP as at other ODOC facilities, inmates are entitled to "be provided with the rules on Prohibited Conduct" during their initial orientation to the facility and to be provided with "a notice of inmate rights" at any disciplinary hearing. OAR-291-105-0013. Such rules or notice must be provided in English to English-speaking inmates and in Spanish to Spanish-speaking inmates, and speakers of other languages must be provided with translation assistance. *See id.* In addition, the entirety of Chapter 291, Division 105 of the Oregon Administrative Rules, including the rules of misconduct contained therein at OAR-291-105-0015, must be posted in the facility legal library and general library, available for review by inmates, with personal copies available to inmates at a specified per-page copying charge. *See id.* Racketeering and distribution of contraband such as controlled substances or other intoxicants are, *inter alia*,

specifically prohibited under the Oregon Administrative Rules, *see* OAR-291-105-0015(4)(f), (n), and each is punishable under the Oregon Administrative Rules by, *inter alia*, confinement in disciplinary segregation for a period up to 120 days, *see* O.A.R. Ch. 291, Div. 105, Exh. 1. "An inmate charged with committing a rule violation may be placed in temporary disciplinary segregation status pending resolution of the charge." OAR-291-105- 0021(3). "This action will be taken when the functional unit manager or the officer in-charge determines that the alleged rule violation charged is of such seriousness that the good order and security of the facility requires immediate removal of the inmate from the general population, or it is determined the inmate is a threat to the community or is likely to escape or abscond." *Id.*

Upon report of prohibited inmate conduct, a facility hearings officer must conduct a formal hearing to be scheduled as soon as is practicable, unless such hearing is waived by the inmate. *See* OAR-291-105-0021(4), OAR-291-105-0028(1). At such a hearing, the hearings officer must make findings of fact by a preponderance of the evidence, *see* OAR-291-105-0028(3), and if the hearings officer determines that a rule violation occurred, the hearings officer must impose an appropriate disciplinary sanction, *see* OAR-291- 105-0028(11). Administrative review of any such sanction is available upon the filing of a petition for such review with the Inspector General within sixty days after a final order for such sanction is signed. *See* OAR-291-105-0085(1).

A hearing regarding reported prohibited inmate conduct "may be postponed or continued by the hearings officer . . . for a reasonable period of time for good cause." OAR-291-105-0064(1). "Good cause" for such postponement or continuance may include (*inter alia*) the necessity for "[g]athering of additional evidence (*e.g.*, calling of witnesses, gathering of

witnesses' statements, investigation, acquisition of physical evidence)," OAR-291-105-

0064(2)(c), or "[a]voiding interference with an ongoing police investigation or pending

prosecution," OAR-291-105-0064(2)(d).

> If an inmate has been lodged in temporary disciplinary segregation pending a
> hearing and a continuance or postponement is ordered on the motion of the
> hearings officer, the hearings officer shall consider retention of the inmate in
> disciplinary segregation and [either]:
>
> > (a)    Determine that the inmate no longer presents a threat to security
> > and recommend to the functional unit manager of the facility where
> > the inmate is in disciplinary segregation, that the inmate be
> > released from disciplinary segregation pending conclusion of the
> > hearing; or
> >
> > (b)    Determine that the rule violation(s) alleged is [sufficiently] serious
> > that, if proven, the inmate would present an immediate and
> > continuing threat to the safety, security or orderly operation of the
> > facility and order, subject to the approval of the functional unit
> > manager of the facility where the inmate is in disciplinary
> > segregation, that the inmate be retained in disciplinary segregation.
> > The written approval of the functional unit manager of the facility
> > where the inmate is in disciplinary segregation shall be made a part
> > of the record. In no case shall the inmate be retained in
> > disciplinary segregation for a period longer than that permitted by
> > the sanction in the appropriate box on the disciplinary grid.

OAR-291-105-0064(4).

At OSP, as at other ODOC facilities, inmates found to be in violation of the rules of

prohibited conduct are placed in disciplinary segregation. *See* OAR-291-011-0005(2),

OAR-291-011-0025(1). Disciplinary segregation is the "placement of an inmate in a housing

program status which separates him/her from the main population of the facility." OAR-291-

011-0010(2). "Inmates assigned to disciplinary segregation shall remain so assigned for only the

shortest length of time necessary to achieve the purpose for which [such] assignment was

prescribed." OAR-291-011-0030(1). Inmates assigned to disciplinary segregation may be

Page 11 - FINDINGS AND RECOMMENDATION

restricted in their access to services and activities available to members of the facility's general population. *See* OAR-291-011-0060, OAR-291-011-0064. Administrative review of an inmate's assignment to disciplinary segregation is available upon the filing of a petition for such review with the Inspector General within sixty days after a final order for such assignment is signed. *See* OAR-291-105-0085(1).

Similarly, administrative segregation is the placement of an inmate into "[h]ousing separate and apart from the general population" of the facility. OAR-291-044-0010(1), *see also* OAR-291-044-0010(3). At OSP, as at other ODOC facilities, inmates are placed in administrative segregation (by contrast with disciplinary segregation) if they either "[c]onstitute a continuing or immediate threat to the safety, security, and orderly operation of the facility," OAR-291-046-0005(2)(a), or "[r]equire protective custody," OAR-291-046-0005(2)(b). "An inmate may be voluntarily or involuntarily assigned to administrative housing for a period not to exceed 30 days without a hearing." OAR-291-046-0014. With an inmate's consent and the inmate's functional unit manager's authorization, where protective custody is warranted and no reasonable alternative is available, an inmate may be voluntarily placed in administrative segregation for periods in excess of thirty days. OAR-291-046-0020(1). An inmate may only be involuntarily placed into administrative segregation for a period in excess of thirty days "when information verified through [a hearing before a hearings officer conducted in accordance with OAR-291-046-0030] shows the inmate to constitute an immediate and continuing threat to the safety, security, and orderly operation of the facility." OAR-291-046-0025(2). "Inmates involuntarily assigned to administrative segregation or protective custody will be reassigned to the general population once their involuntary timeframe has been completed, but the assignment

shall not exceed 180 days without due process." OAR-291-046-0085(2). Administrative review

of an inmate's placement into administrative segregation is available upon the filing of a petition

for such review with the Assistant Director of Operations within thirty days after a

recommendation for such placement is signed. See OAR-291-046-0100(1).

### C.    Facts Underlying Martinez' Claim Set Forth in his Originally Filed Complaint[3]

Martinez has been in ODOC custody since April 6, 2011. *See* Yancey Decl., ¶ 3.

Immediately prior to the events complained of in this lawsuit, Martinez was housed in the

general population at OSP. *See id.* at ¶ 12; *see also id.*, Exh. 1. During the period of Martinez'

incarceration at OSP prior to the events complained of in this lawsuit, OSP officials issued a

misconduct report alleging Martinez' involvement in a conspiracy to sell and/or traffic in illegal

narcotics at OSP. *See id.* at ¶ 12. Martinez was charged with two counts of prohibited inmate

conduct, specifically racketeering and distribution of contraband. *See id.*

Pending a hearing on the charged misconduct, on August 3, 2012, Martinez was

transferred from OSP to disciplinary segregation at Two Rivers Correctional Institution. *See id.*;

*see also* Declaration (#57) of Leonel O. Martinez ("Martinez Decl. I"), ¶ 3; Declaration (#88) of

Leonel O. Martinez ("Martinez Decl. II"), ¶ 4. The hearing took place on August 30, 2012.

*See* Yancey Decl., Exh. 5 at 6. At the hearing, the hearings officer "postponed the hearing in

order to hear all involved inmates' statements, examine the details in the large quantity of

confidential information provided with the case, and to consider all of the evidence." *Id.*, Exh. 5

at 1. On that same date, Martinez' continued disciplinary segregation pending the postponed

---

[3] Except where otherwise indicated, the facts recited under this subject heading are undisputed.

Page 13 - FINDINGS AND RECOMMENDATION

hearing was approved by a TRCI Captain. *See id.*, Exh. 5 at 4.

On September 12, 2012, following review of the evidence presented at the hearing, the hearings officer ordered the charges against Martinez dismissed for want of prosecution, expressly because "[m]ost of the evidence" of Martinez' culpability was presented in "Confidential Information . . . packets" that were "inadmissible to [Martinez]" and therefore unavailable to him in preparing his defense. *Id.*, Exh. 5 at 1. The hearings officer specifically ordered that the accusing officer(s) be given the opportunity to submit a new misconduct report regarding the same underlying incidents, presenting "more evidence connecting [Martinez] with the charges" in a form that Martinez would have the opportunity to review in order to "prepare an adequate defense." *Id.*

Martinez continued to be held in disciplinary segregation at TRCI, apparently pending submission of the contemplated new misconduct report. *See* Yancey Decl., ¶ 13; *see also* Martinez Decl. I, ¶ 7; Martinez Decl II, ¶¶ 4-5. The record does not suggest that the hearings officer made any express determination on September 12, 2012 (or at any other time following August 30, 2012), that Martinez presented a threat warranting continued retention in disciplinary segregation pending submission of a new misconduct report, or that any TRCI functional unit manager approved Martinez' continued disciplinary segregation following the September 12, 2012, dismissal of the charges against Martinez (or at any other time following August 30, 2012). *See, e.g.*, Martinez Decl. II, ¶ 20.

On November 8, 2012, no new misconduct report having been submitted, defendant Yancey recommended that Martinez be released from disciplinary segregation. *See* Yancey Decl., ¶ 13. Apparently likewise on Yancey's recommendation, on November 8, 2012, Martinez

was identified as a high alert management inmate warranting STM supervision.[4]  *See id.*, ¶ 14.

On November 15, 2012, Martinez was released back into the general population at OSP. *See id.*, ¶ 15.; *see also* Martinez Decl. I, ¶ 7; Martinez Decl. II, ¶¶ 4-5.  At OSP, Martinez was placed under STM supervision "for a minimum of six months."  *See* Yancey Decl., ¶ 15.  At no time was Martinez provided with a written "Inmate Management Plan" as required under OAR-291-069-0270(2) (discussed *supra*).  *See* Yancey Decl., ¶ 17.  Instead, Yancey provided Martinez with a verbal indication of the behavior that would be expected of him during his time under STM supervision.  *See id.*

On or around November 27, 2012, Martinez made an untimely request (*see* OAR-291-105-0085(1), discussed *supra*) for administrative review of his placement into disciplinary segregation on August 3, 2012, and/or of his remand to disciplinary segregation following the September 12, 2012, dismissal of the charges against him for want of prosecution.  *See* Yancey Decl., ¶ 18; *see also id.*, Exh. 3 at 2-5.  On or around January 3, 2013, having received no response to his untimely request for administrative review, Martinez addressed an inmate communication to the "Inspector General Chief Investigator" complaining about the failure to respond.  *See id.*, Exh. 3 at 6.  On February 19, 2013, defendant Yancey wrote a letter to Martinez in response to his request for administrative review, advising him that he had been "place[d] on the STM caseload for a period of six months starting on November 8, 2012," because OSP had "receive[d] enough intelligence" in the course of an investigation of Martinez' involvement in "the sales and trafficking of illegal narcotics . . . to warrant [his] placement on the

---

[4]  Martinez offers his declaration testimony that he had been placed under STM supervision as of or prior to the date of his placement into disciplinary segregation, specifically August 3, 2012.  *See* Martinez Decl. II, ¶¶ 5, 12.

Page 15 - FINDINGS AND RECOMMENDATION

STM caseload for administrative actions." *Id.*, Exh. 3 at 1; *see also id.*, ¶ 18.

Martinez was removed from STM supervision on or around May 8, 2013. *See id.* at ¶¶ 4,

20. During the six month period of Martinez' STM supervision, no restrictions were imposed on

him other than those generally applicable to the OSP general population and the sole additional

restriction that he was required to obtain permission from the OSP STM lieutenant before

effecting any change in his work assignments or housing assignments. *See id.* at 16. The

evidence contains no suggestion that such permission was denied at any time during Martinez'

STM supervision. Martinez offers his declaration testimony only that his placement under STM

supervision "made it hard to obtain call passes" (although he does not testify that he was unable

to obtain such passes while under STM supervision under circumstances where such passes

would have been available to a member of the general population), Martinez Decl. II, ¶ 6, that

other inmates not parties to this action may have experienced unwarranted discipline and

unwarranted restrictions while under STM supervision, *see* Martinez Decl. I, *passim*, Martinez

Decl. II, *passim*, and that while under STM supervision he "lived in fear" that he would be

subjected to unwarranted discipline or unwarranted restrictions by STM officers motivated by

retaliatory animus, *see* Martinez Decl. I, *passim*, Martinez Decl. II, *passim*.

**D.    Allegations Underlying Martinez' Claim Set Forth in his Supplemental Complaint[5]**

On July 8, 2013, Martinez was eating in the OSP inmate mess hall when he was

approached by defendants Yancey and Stephenson who informed him that he would be placed

---

[5] Except where otherwise indicated, the following recitation constitutes my construal of the allegations of plaintiff Martinez' complaint and of the matters properly subject to judicial notice in the light most favorable to Martinez.

Page 16 - FINDINGS AND RECOMMENDATION

into disciplinary segregation for his suspected role in influencing another inmate to assault a corrections officer. *See* Supplemental Complaint (#82), ¶ 1. Yancey and Stephenson lacked any evidentiary basis for believing that Martinez could have been involved in motivating the assault, and instead were motivated by retaliatory animus for Martinez' conduct in complaining about the events underlying his claim set forth in his originally filed complaint. *See id.*, ¶¶ 2, 7-8. Martinez was placed into disciplinary segregation that same day, and held there until July 29, 2013. *See id.*, ¶¶ 5, 7. When Martinez was released back into the general population at OSP on July 29, 2013, he found that his legal papers pertaining to this action had been crumpled into balls "like the appearance of trash." *Id.*, ¶¶ 5-6.

## ANALYSIS

As noted above, by and through his originally filed complaint Martinez alleges the liability of defendants Peters, Premo, Yoder, Yancey, Ufford, and Franke under 42 U.S.C. § 1983 for the violation of his Fourteenth Amendment rights to due process and equal protection in connection with his continued disciplinary segregation at TRCI between September 12 and November 15, 2012, his placement under STM supervision from November 8 (or August 3), 2012, until approximately May 8, 2013, and the restrictions placed on his while he was under STM supervision. Also as noted above, by and through his supplemental complaint Martinez alleges the liability of defendants Peters, Premo, Yoder, Yancey, Ufford, Franke, and Stephenson under Section 1983 for the violation of his Fourteenth Amendment rights in connection with his placement into disciplinary segregation at OSP from July 8 to 29, 2013. Martinez and the defendants have filed cross-motions for summary adjudication of Martinez' Section 1983 claim set forth in his originally filed complaint, and the defendants separately move for dismissal of

Page 17 - FINDINGS AND RECOMMENDATION

Martinez' Section 1983 claim set forth in his supplemental complaint. I consider each set of motions in turn.

I.    **The Parties' Cross-Motions for Summary Adjudication of Martinez' Section 1983 Claim Set Forth in his Originally Filed Complaint**

As noted above, Martinez' Section 1983 claim set forth in his originally filed complaint is premised on deprivations of his Fourteenth Amendment due process and equal protection rights, arising out of the conduct of defendants Peters, Premo, Yoder, Yancey, Ufford, and Franke in permitting his disciplinary segregation to continue following the dismissal of misconduct charges against him from September 12 through November 15, 2012, and in placing him under STM supervision on or before November 8, 2012, and/or in restricting his liberty in connection with his STM supervision between November 15, 2012, and May 8, 2013.

Defendants do not address Martinez' claim to the extent it may arise under the Equal Protection Clause of the Fourteenth Amendment, and Martinez does not argue that his claim may survive summary judgment on an equal protection theory. The Equal Protection Clause is a guarantee that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The gravamen of that guarantee is that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), *citing Plyler v. Doe*, 457 U.S. 202, 216 (1982). In light of the fact that Martinez sought class treatment of his claim and, accordingly, expressly pled that he and all other similarly situated prisoners were subjected to the same purported deprivations of rights, I agree with the defendants' implicit conclusion that his claim cannot lie under the Equal Protection Clause but rather must lie, if at all, under the Due Process Clause. Moreover, as pled, his claim is colorable specifically and solely as a Section 1983 claim for deprivation of liberty without due process of

Page 18 - FINDINGS AND RECOMMENDATION

law.

> § 1983 affords a "civil remedy" for deprivations of federally protected rights
> caused by persons acting under color of state law without any express requirement
> of a particular state of mind.  Accordingly, in any § 1983 action the initial inquiry
> must focus on whether the two essential elements to a § 1983 action are present:
> (1) whether the conduct complained of was committed by a person acting under
> color of state law; and (2) whether this conduct deprived a person of rights,
> privileges, or immunities secured by the Constitution or laws of the United States.

*Parratt v. Taylor*, 451 U.S. 527, 535 (1981).  To prevail on a procedural due process claim under

Section 1983, a plaintiff must establish:  "(1) a liberty or property interest protected by the

Constitution; (2) a deprivation of the interest by the government; and (3) lack of process."

*Wright v. Riveland*, 219 F.3d 905, 913 (9th Cir. 2000) (internal modifications omitted), *quoting*

*Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993).

Here, the defendants challenge only whether the complained-of deprivations constitute

deprivations of a liberty interest protected by the Constitution.  For the reasons set forth below, I

agree with the defendants that they do not.  In consequence, and for the reasons discussed below,

Martinez' motion for summary judgment should be denied, and defendants' motion for summary

judgment should be granted as to Martinez' Section 1983 claim set forth in his originally filed

complaint.

A.    **Martinez' Section 1983 Claim to the Extent Premised on Disciplinary
       Segregation Imposed Between September 12 and November 15, 2012**

As noted above, Martinez was held in disciplinary segregation at TRCI from August 3

through November 12, 2012.  Initially, Martinez was held pending a hearing on the misconduct

charges against him, and at or in connection with the hearing of August 30, 2012, the hearings

officer found that Martinez represented a threat warranting his continued disciplinary segregation

pending further proceedings, and a TRCI captain – presumably the functional unit manager of the

Page 19 - FINDINGS AND RECOMMENDATION

facility whose approval of such continued segregation was required under OAR-291-105-0064(4)(b) – approved that finding. Effective September 12, 2012, the hearings officer dismissed all misconduct charges against Martinez, and although no new finding was made that Martinez' continued disciplinary segregation was warranted, and no new approval of such segregation issued from the functional unit manager, Martinez was kept in disciplinary segregation until November 15, 2012. Martinez does not appear to argue that the process he received in connection with his initial placement in disciplinary segregation or in connection with his disciplinary segregation between August 30 and September 12, 2012, was inadequate (although he offers the assertion that the 27-day delay between his placement in disciplinary segregation and the hearing of August 30, 2012, was unreasonably long), but rather appears to argue only that he did not receive adequate process of law in connection with his continued segregation between September 12 and November 15, 2012.

This court need not determine whether the finding and approval of August 30, 2012, was sufficient to satisfy defendants' procedural obligations in connection with Martinez' disciplinary segregation following the dismissal of misconduct charges against him, or indeed whether any of the process Martinez received in connection with any or all portions of his tenure in disciplinary segregation was constitutionally adequate, because it is well established that a convicted prisoner has no protected liberty interest in not being confined in disciplinary or administrative segregation. *See Sandin v. Conner*, 515 U.S. 472, 486-487 (1995). For example, in *Resnick v. Warden Hayes*, 213 F.3d 443 (9th Cir. 2000), an incarcerated prisoner alleged that his confinement in disciplinary segregation without first being afforded a hearing constituted a deprivation of a protected liberty interest where the hearing he eventually received did not occur

until 70 days following the misconduct with which he was charged and where he was not

permitted to call witnesses to testify at his behalf at the hearing he eventually received. *See*

*Resnick*, 213 F.3d at 447. The Ninth Circuit disagreed, on the grounds that the prisoner had no

liberty interest in freedom from disciplinary segregation, and therefore did not consider whether

the process of law the prisoner received had been constitutionally adequate. *See id.* at 447-448.

The court reasoned as follows:

> Under *Sandin*, a prisoner possesses a liberty interest under the federal constitution
> when a change occurs in confinement that imposes an "atypical and significant
> hardship . . . in relation to the ordinary incidents of prison life." 515 U.S. at 484.
> In this case, Plaintiff has failed to establish a liberty interest protected by the
> Constitution. That is so because Plaintiff has not alleged that his confinement,
> whether administrative or disciplinary, presented "the type of atypical, significant
> deprivation that might conceivably create a liberty interest." *Id.* at 486. The
> Court in *Sandin* relied on three factors in determining that the plaintiff possessed
> no liberty interest in avoiding disciplinary segregation: (1) disciplinary
> segregation was essentially the same as discretionary forms of segregation; (2) a
> comparison between the plaintiff's confinement and conditions in the general
> population showed that the plaintiff suffered no "major disruption in his
> environment"; and (3) the length of the plaintiff's sentence was not affected. *Id.* at
> 486-87.
>
> * * *
>
> In sum, so far as we know from his complaint, Plaintiff's placement and retention
> in [disciplinary segregation] were "within the range of confinement to be normally
> expected" by prison inmates "in relation to the ordinary incidents of prison life."
> *Id.* at 486-87. Therefore, we conclude that Plaintiff had no protected liberty
> interest in being free from confinement in [disciplinary segregation] pending his
> disciplinary hearing. That being so, Plaintiff has no cognizable due process claim.

*Id.* at 448 (internal modifications omitted); *see also May v. Baldwin*, 109 F.3d 557, 565 (9th Cir.

1997) (holding that convicted inmate was not "denied due process when he was placed in

[disciplinary segregation] pending a disciplinary hearing. [The inmate's] due process claim

fail[ed] because he ha[d] 'no liberty interest in freedom from state action taken within the

Page 21 - FINDINGS AND RECOMMENDATION

sentence imposed,' and the Ninth Circuit explicitly ha[d] found that administrative segregation

falls within the terms of confinement ordinarily contemplated by a sentence"), *citing Sandin*, 515

U.S. at 480, *quoting Toussaint v. McCarthy*, 801 F.2d 1080, 1091-1092 (9th Cir. 1986). All of

the factors relied upon by the *Resnick* court are present here as well.

Because Martinez' placement into disciplinary segregation was, in light of his status as a

convicted prisoner, not a deprivation of a protected liberty interest, Martinez had no

constitutionally protected right to due process in connection with that placement. In

consequence, Martinez' claim cannot survive summary judgment to the extent premised on his

placement into disciplinary segregation.

> **B.    Martinez' Section 1983 Claim to the Extent Premised on His Placement
> Under STM Supervision and/or Restrictions on His Liberty Occasioned by
> Such Placement**

As noted above, defendants offer evidence that Martinez was placed under STM

supervision as of November 8, 2012, whereas Martinez declares that he was under STM

supervision from or prior to the date of his placement into disciplinary segregation, specifically

August 3, 2012. It is undisputed that Martinez remained under STM supervision until

approximately May 8, 2012. During the period of his STM supervision, STM officers imposed

no restrictions on his activities other than the requirement that he receive the permission of an

STM lieutenant prior to making any changes in his work assignment or housing, and the only

hardship Martinez suffered in consequence of his classification as a high alert management

inmate was that such classification made it more difficult for him to obtain call passes.

I note that it is further undisputed that defendants openly failed to comply with their clear

obligations under applicable Oregon Administrative Rules in connection with Martinez'

Page 22 - FINDINGS AND RECOMMENDATION

placement under STM supervision.  In particular, I am gravely troubled by defendants' blithe assertion that there was no need to provide Martinez with a written Inmate Management Plan (*see* OAR-291-069-0270(2)(a)) because he received a verbal indication from defendant Yancey of the STM unit's expectations for his conduct.  Clearly, such disregard of unambiguous safeguards of inmate rights could lead to mischief, as for example where, in the absence of a written Inmate Management Plan, STM Unit personnel might impose draconian restrictions on an inmate's activities or extend the period of an inmate's period of STM supervision based on violations of terms of the inmate's supervision that were never communicated to him or her. Here, however, defendants' failures to comply with such obligations cannot have contributed to causation of Martinez' alleged injury, because no special restrictions were imposed on him and the term of his supervision was never extended.

Moreover, as with Martinez' claim to the extent premised on his placement into disciplinary segregation, the court need not consider whether Martinez received all process he was due in connection with his placement under STM supervision, because such supervision does not rise to the level of a constitutional deprivation fo a liberty interest.  As noted above, a prisoner suffers a deprivation of a protected liberty interest only in connection with a "change . . . in confinement that imposes an 'atypical and significant hardship . . . in relation to the ordinary incidents of prison life.'"  *Resnick*, 213 F.3d at 448, *quoting Sandin*, 515 U.S. at 484.  STM supervision, as experienced by Martinez, did not constitute an atypical departure from the ordinary conditions of confinement within the general population at OSP, and in consequence did not deprive Martinez of any constitutionally protected interest in liberty.  In consequence, Martinez' claim cannot survive summary judgment to the extent premised on his placement under

Page 23 - FINDINGS AND RECOMMENDATION

STM supervision.

II.    **Defendants' Motion to Dismiss Martinez' Section 1983 Claim Set Forth in his Supplemental Complaint**

As noted above, Martinez' Section 1983 claim set forth in his supplemental complaint is premised on deprivations of his Fourteenth Amendment due process and equal protection rights, arising out of the conduct of defendants Peters, Premo, Yoder, Yancey, Ufford, Franke, and Stephenson in placing him into disciplinary segregation between July 8 and 29, 2013, and/or in vandalizing his property while he was so segregated.  Although it is clear that Martinez' placement into disciplinary segregation between July 8 and 29, 2013, did not as a matter of law constitute a deprivation of a constitutionally protected liberty interest giving rise to a viable Section 1983 claim, *see supra*, defendants do not challenge his claim on that ground but rather properly seek its dismissal for failure to exhaust administrative remedies under the Prison Litigation Reform Act ("PLRA").

Under the PLRA, incarcerated plaintiffs are required to exhaust all administrative remedies available to them within the institutions in which they are housed before bringing any federal action in connection with prison conditions, including such actions brought under 42 U.S.C. § 1983:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).  For purposes of the PLRA, actions brought with respect to "prison conditions" include all actions brought to challenge isolated episodes of unconstitutional or otherwise unlawful misconduct of any kind as well as prisoner petitions challenging conditions

Page 24 - FINDINGS AND RECOMMENDATION

of confinement. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Under the PLRA, the courts lack discretion to consider claims challenging prison conditions, including claims for money damages, except where such claims are filed following complete exhaustion of available administrative remedies, without regard to the nature of the administrative remedies available under such administrative grievance procedures. *See id.* at 524, *citing Booth v. Churner*, 532 U.S. 731, 739, 740 n. 5, 741 (2001).

Inmates are not required to plead or demonstrate exhaustion before bringing prison-conditions lawsuits. *Jones v. Bock*, 549 U.S. 199, 216 (2007). To the contrary, an incarcerated plaintiff's failure to satisfy the PLRA exhaustion requirement is an affirmative defense that is the burden of the defendant in a prison-conditions lawsuit to raise and prove. *See id.* Following the Ninth Circuit's *en banc* decision in *Albino v. Baca*, 747 F.3d 1162 (9th Cir. 2014), the courts of the Ninth Circuit treat challenges to a prisoner's exhaustion of administrative remedies as motions for summary judgment if premised on proffered evidence, and as motions to dismiss for failure to state a claim if premised on the incarcerated plaintiff's pleading alone. *See Albino*, 747 F.3d at 1166. Here, defendants have brought their pleading-based challenge to Martinez' exhaustion of administrative remedies as an unenumerated Federal Civil Procedure Rule 12(b) motion to dismiss; I construe it as a motion to dismiss under Federal Civil Procedure Rule 12(b)(6).

This action was filed on March 6, 2013. The events underlying Martinez' Section 1983 claim set forth in his supplemental complaint took place more than four months later, from July 8 to 29, 2013. It is clear that Martinez cannot have exhausted administrative remedies as to his placement into disciplinary segregation more than four months prior to the date that such

Page 25 - FINDINGS AND RECOMMENDATION

placement occurred. Moreover, it is well established that "the PLRA requires that a prisoner exhaust administrative remedies before submitting any papers to the federal courts." *Vaden v. Summerhill*, 449 F.3d 1047, 1048 (9th Cir. 2006); *see also id.* at 1050 ("Presuit exhaustion provides a strong incentive that will further . . . Congressional objectives [to reduce the quantity and improve the quality of prisoner suits]; permitting exhaustion *pendente lite* will inevitably undermine attainment of them") (internal modifications omitted), *quoting McKinney v. Carey*, 311 F.3d 1198, 1200-1201 (9th Cir. 2002) (*per curiam*).

Under the PLRA and applicable Ninth Circuit jurisprudence, this court lacks either authority or discretion to consider Martinez' Section 1983 claim set forth in his supplemental complaint. In consequence, defendants' motion to dismiss should be granted, and Martinez' Section 1983 claim premised on his placement into disciplinary segregation from July 8 to 29, 2013, should be dismissed without prejudice.

## CONCLUSION

For the reasons set forth above, Martinez' motion (#55) for summary judgment should be denied, defendants' motion (#72) for summary judgment should be granted, defendants' motion (#91) to dismiss should be granted, summary judgment should be entered in defendants' favor as to Martinez' Section 1983 claim set forth in his originally filed complaint, and Martinez' Section 1983 claim set forth in his supplemental complaint should be dismissed without prejudice. A final judgment should be prepared.

## SCHEDULING ORDER

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due fourteen (14) days from service of the Findings and Recommendation. If no objections

are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due fourteen (14) days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

### NOTICE

A party's failure to timely file objections to any of these findings will be considered a waiver of that party's right to *de novo* consideration of the factual issues addressed herein and will constitute a waiver of the party's right to review of the findings of fact in any order or judgment entered by a district judge. These Findings and Recommendation are not immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment.


Dated this 3rd day of March, 2015.

Honorable Paul Papak
United States Magistrate Judge

Page 27 - FINDINGS AND RECOMMENDATION